1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LARRY DUN,

11          Petitioner,                    No. CIV S-05-2092 WBS CHS P

12       vs.

13   ROSANNE CAMPBELL, et al.,

14          Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16                        I.  INTRODUCTION

17          Petitioner Larry Dun is a state prisoner proceeding through counsel with a second

18   amended petition for writ of habeas corpus brought pursuant to 28 U.S.C. §§ 2254.[1]  He is

19   currently serving an indeterminate life sentence for the 1975 murder, rape, and robbery of his

20   next door neighbor.  Petitioner does not challenge the propriety of his convictions; rather, he

21   challenges the execution of his sentence, and specifically, the constitutionality of the October 19,

22   2005 decision of the Board of Parole Hearings ("Board") finding him unsuitable for parole.

23

24          [1] Although the petition purports to seek relief under both §§ 2241 and 2254, relief is only
     available under § 2254 since petitioner is in custody pursuant to a judgement of a state court.
25   *White v. Lambert*, 370 F.3d 1002, 1006-07 (9th Cir. 2004) ("it is only when § 2254 does not
     apply to a state prisoner (because he is not in custody pursuant to a state court judgment) that he
26   can resort to... § 2241").

## II. ClAIMS PRESENTED

The claims presented in the petition are as follows: (A) the 2005 decision of the Board finding petitioner unsuitable for parole was lacking in evidentiary support, in violation of his right to due process of law (claims 1 and 2 in the second amended petition); (B) the Board's decision also violated his right be free from cruel and unusual punishment (claims 4 and 5 in the second amended petition); and (C) the Board failed to engage in individualized decision making at petitioner's hearing, instead implementing an unwritten policy of blanket denial for convicted murderers (claim 3 in the second amended petition).  For the reasons set forth below, petitioner is not entitled to habeas corpus relief on any of his claims.

## III. FACTUAL AND PROCEDURAL BACKGROUND

On February 5, 1976, petitioner went next door to Maryanne Jacob's home. (Resp. Exhibit[2] 2 at 7.)  His father had sent him there to obtain a contractor's address.  (*Id*.) Petitioner took a knife with him as he went to Jacob's home.[3]  (*Id*. at 10.)  When petitioner arrived, Jacobs let him in.  (*Id*. at 7.)  Jacobs talked with him and located the address of the contractor.  (*Id*. at 10.)  Then, petitioner raped Jacobs.  (*Id*. at 7, 10.)  After petitioner raped Jacobs, he smashed a lamp on her head and tied her up.  (*Id*. at 7, 19.)  While Jacobs was restrained, petitioner stabbed her repeatedly.  (*Id*. at 19.)  Then he left the home, taking with him a butcher knife, a cigarette case, cigarette lighter, and two table lamps.  (*Id*. at 3.)

The medical examiner noted that Jacobs suffered 23 significant wounds, eighteen of which were stab wounds to her neck, back, chest, and abdomen.  (Resp. Exhibit 2 at 19.)  The most serious wound was a "gaping wound on the front of the neck, severing all the structures except the backbone."  (*Id*.)  The medical examiner concluded that Jacobs died as a result of a

---

[2] All citations to respondent's exhibits refer to the exhibits attached to respondent's answer, filed 8/24/07.

[3] Although petitioner carried his own knife, the crime was committed with a different knife obtained from Jacob's home.

1   massive hemorrhage caused by the multiple stab and incised wounds.  (*Id.*)

2              Petitioner was 19 years old when he committed the offenses against Jacobs.

3   (Pet. Exhibit[4] 2; Resp. Exhibit 5 at 13.)  According to the probation officer's report prepared

4   prior to sentencing, petitioner was also implicated in three other rapes.  (Resp. Exhibit 2 at 13-

5   14.)  Following his arrest and the appearance of his picture in the newspaper, two sisters

6   contacted authorities and identified petitioner as the individual who had attempted to rape one of

7   them in their home three years prior, on January 28, 1973.  (*Id.* at 13.)  Petitioner's photo was

8   then included in a photo lineup viewed by two other female juveniles, who had reported to

9   officers an incident of attempted rape and robbery at one of the girls' residence on December 15,

10  1973.  (*Id.* at 14.)  One of the two girls identified petitioner through the photo lineup as the

11  individual who looked like the person who had committed the offense.  (*Id.*)  Finally, another

12  juvenile girl identified petitioner from a photo lineup as the individual who had raped and robbed

13  her on December 22, 1975.  (*Id.*)

14             Reports from the Stockton Police Department indicate that petitioner admitted his

15  involvement in the incidents of January 28, 1973 and December 22, 1975 to an officer during

16  questioning.  (*Id.*)  Petitioner, however, denies that he ever admitted or confessed to any of the

17  crimes except for the February 5, 1976 commitment offenses.  (Second Amended Petition at 5.)

18  When asked at his October 19, 2005 parole hearing why this information appeared in the

19  probation officer's report, petitioner stated:

20             When I got arrested, this police officer, Sergeant Stuart, something
              like that, upon interrogation-- I wanted to talk to my folks on the
21            telephone, and he said that I should sign these papers saying that I
              did these other things before I could talk to my parents.  And I said
22            "well," and he said "or you're not going to talk to them."  And I
              said "all right, I'll sign it."  So I got to talk to my folks, and after I
23            finished talking to them I said "I'm not going to sign these" and he
              said "well, why not?" and I told him "I didn't do these things.  I'm
24            guilty of what I've done here, today, and I didn't do anything else."

25  _____

26     [4] All citations to petitioner's exhibits refer to the exhibits attached to the second amended
    petition filed 7/19/07.)

1   And he said, "well, you've as good as signed it," and the probation
2   officer followed his recommendation.

3   (Pet. Exhibit 2 at 15-16.)

4   Petitioner was indicted for the February 5, 1976 murder, rape and robbery of

5   Maryanne Jacob.  A separate count charged in the indictment alleged that he had also committed

6   the December 22, 1975 forcible rape.  (Pet. Exhibit 1 at 105-07.)  Petitioner entered pleas of not

7   guilty and not guilty by reason of insanity.  He was found sane and convicted of first-degree

8   robbery, first-degree murder, and the forcible rape of Jacob.  (Id. at 49-51.)  On the prosecutor's

9   motion, the count alleging the unrelated December 1975 forcible rape was dismissed.  (*Id*. at

10   164.)  Petitioner was thus convicted of the offenses he committed against Jacob only.

11   Petitioner was sentenced under California's Indeterminate Sentencing Law to an

12   indeterminate life term on the murder count.  The sentences on the rape and robbery counts were

13   stayed pending completion of the murder sentence.  (Pet. Exhibit 1 at 88-91.)  Petitioner was

14   received in the state prison on April 5, 1977.  (*Id*. at 2-4.)  His minimum eligible parole date

15   passed on February 5, 1983.  (*Id*. at 245.)  On October 19, 2005, the Board of Parole Hearings

16   conducted the subsequent parole suitability hearing at issue and once again found him unsuitable

17   for parole.  Petitioner raised his claim arising from the Board's denial with the California

18   Supreme Court.  That petition was denied on July 18, 2007.

19   IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

20   An application for writ of habeas corpus by a person in custody under judgment of

21   a state court can be granted only for violations of the Constitution or laws of the United States.

22   28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

23   *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

24   This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

25   the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

26   U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

1  AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

2  state court proceedings unless the state court's adjudication of the claim:

3           (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
4           determined by the Supreme Court of the United States; or

5           (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
6           State court proceeding.

7  28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

8  *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

9  The court will look to the last reasoned state court decision in determining whether the law

10  applied to a particular claim by the state courts was contrary to the law set forth in the cases of

11  the United States Supreme Court or whether an unreasonable application of such law has

12  occurred.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919

13  (2003).

14                                V.  DISCUSSION

15      A.      Due Process

16           The Due Process Clause of the Fourteenth Amendment prohibits state action that

17  deprives a person of life, liberty, or property without due process of law.  A person alleging a due

18  process violation must first demonstrate that he or she was deprived of a protected liberty or

19  property interest, and then show that the procedures attendant upon the deprivation were not

20  constitutionally sufficient.  *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 459-60

21  (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

22           A protected liberty interest may arise from either the Due Process Clause or from

23  state laws.  *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States Constitution

24  does not, in and of itself, create a protected liberty interest in a parole date.  *Jago v. Van Curen*,

25  454 U.S. 14, 17-21 (1981).  However, where a state's statutory scheme uses mandatory language,

26  it "creates a presumption that parole release will be granted" when or unless certain designated

1  findings are made, thereby giving rise to a constitutional liberty interest. *McQuillion*, 306 F.3d at

2  901 (*quoting Greenholtz v. Inmates of Nebraska Penal*, 442 U.S. 1, 12 (1979)). The Ninth

3  Circuit has conclusively determined that California state prisoners who have been sentenced to

4  prison with the possibility of parole have a clearly established, constitutionally protected liberty

5  interest in receipt of a parole release date." *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007)

6  (*citing Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *Biggs v. Terhune*,

7  334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903; and *Allen*, 482 U.S. at 377-78

8  (*quoting Greenholtz*, 442 U.S. at 12)).

9            The full panoply of rights afforded a defendant in a criminal proceeding is not

10  constitutionally mandated in the context of a parole proceeding. *See Pedro v. Or. Parole Bd.*,

11  825 F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme Court has held that a parole board's

12  procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a

13  decision informing him of the reasons he did not qualify for parole.[5]  *Greenholtz*, 442 U.S. at 16.

14  The Ninth Circuit has also made clear that Supreme Court law clearly establishes that some

15  evidence must support a parole decision. *Sass*, 461 F.3d at 1128-29; *McQuillion*, 306 F.3d at

16  904.

17            Under the some evidence standard, a decision cannot be "without support" or

18  "arbitrary." *McQuillion*, 306 F.3d at 904 (*citing Superintendent v. Hill*, 472 U.S. 445, 457

19  (1985)); *Biggs*, 334 F.3d at 915. It must have some indicia of reliability. *Id*. The standard is

20  "minimally stringent," and a decision must be upheld if there is any evidence in the record that

21  could support the conclusion reached. *Powell v. Gomez*, 33 F.3d at 40 (*citing Cato v. Rushen*,

22  824 F.2d 703, 705 (9th Cir. 1987)); *Toussaint v. McCarthy*, 801 F.2d 1080, 1105 (9th Cir. 1986).

23  Examination of the entire record is not required. *Id*. The Supreme Court has specifically

24  directed reviewing courts not to assess the credibility of witnesses or re-weigh the evidence.

25  _____

26            [5] Petitioner does not contest that he received notice of his October 19, 2005 parole
hearing, an opportunity to appear, and a copy of the decision rendered by the Board.

1   *Hill*, 472 U.S. at 455.  The only relevant question is whether there is *any* reliable evidence in the

2   record that could support the decision reached.  *See Id*.; *Toussaint*, 801 F.2d at 1105.

3          In evaluating whether the Board's finding of parole unsuitability was supported by

4   some evidence, the analysis "is framed by the statutes and regulations governing parole

5   suitability determinations in the relevant state."  *Irons*, 505 F.3d at 851.  The court is bound by

6   California's construction of its own laws in this regard.  *See Bradshaw v. Richey*, 546 U.S. 74, 76

7   (2005).  The court "must look to California law to determine the findings that are necessary to

8   deem [a petitioner] unsuitable for parole, and then must review the record to determine whether

9   the state court decision holding that these findings were supported by 'some evidence' [ ]

10  constituted an unreasonable application of the 'some evidence' principle."  *Id*.

11         Title 15, Section 2281 of the California Code of Regulations sets forth factors to

12  be considered by the Board regarding parole suitability findings for life prisoners.  The regulation

13  is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of

14  danger to society if released from prison," and thus whether he or she is suitable for parole.  *In re*

15  *Lawrence*, 44 Cal.4th 1181, 1214, 1202 (2008).  The Board is directed to consider all relevant,

16  reliable information available regarding

17             the circumstances of the prisoner's social history; past and present
                mental state; past criminal history, including involvement in other
18             criminal misconduct which is reliably documented; the base and
                other commitment offenses, including behavior before, during and
19             after the crime; past and present attitude toward the crime; any
                conditions of treatment or control, including the use of special
20             conditions under which the prisoner may safely be released to the
                community; and any other information which bears on the
21             prisoner's suitability for release.

22  Cal. Code Regs. tit. 15, § 2281(b).  The regulation also lists various circumstances that may tend

23  to show suitability or unsuitability for parole.  Cal. Code Regs. tit. 15, § 2281 (c) and (d).

24         Circumstances that may tend to show unsuitability for release are as follows: (1)

25  the offense was committed in an especially heinous, atrocious, or cruel manner; (2) previous

26  record of violence; (3) unstable social history; (4) the crime was a sadistic sexual offense; (5)

7

1   lengthy history of severe mental problems related to the offense; and (6) serious misconduct in

2   prison.  Cal. Code Regs. tit. 15, §2281(c).  Circumstances that may tend to show suitability for

3   parole are set forth as follows: (1) no juvenile record; (2) stable social history; (3) signs of

4   remorse; (4) significant stress as a motivation for the crime; (5) battered woman syndrome; (6)

5   lack of criminal history; (7) age; (8) understanding and plans for future; (9) positive institutional

6   behavior.  Cal. Code Regs. tit. 15, §2281(d).

7           The overriding concern in determining parole suitability is public safety and the

8   focus is on the inmate's *current* dangerousness.  *In re Lawrence*, 44 Cal. 4th at 1205.  Thus, "the

9   proper articulation of the standard of review is not whether some evidence supports the *reasons*

10  the Board cites for denying parole, but whether some evidence indicates that a parolee's release

11  *unreasonably endangers public safety.  See In re Lawrence*, 44 Cal.4th at 1254.

12           Here, the Board's decision that petitioner was unsuitable for parole was based

13  primarily on his commitment offense.  (Pet. Exhibit 2 at 55.)  Specifically, the Board found that

14  the commitment offense was especially cruel and callous.  (*Id*.)  It was stated that the murder of

15  the victim following the rape was "overkill," incredibly brutal," and that it "must have been a

16  long, protracted, horrific event for this poor woman."  (*Id*. at 58.)

17           Although the focus under California law is the current dangerousness of the

18  inmate, the gravity of the commitment offense alone can be a sufficient basis for denying parole

19  in cases where the facts are especially heinous or particularly egregious.  *In re Rosenkrantz*, 29

20  Cal.4th 616, 682 (2002); s*ee also Biggs v. Terhune*, 334 F.3d 910, 913-16 (9th Cir. 2003); *Sass v.*

21  *Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1126 (9th Cir. 2006); *Irons v. Carey*, 505 F.3d 846,

22  852-53 (9th Cir. 2007).[6]  Here, petitioner not only raped his victim, he smashed her head with a

23

24           [6] In another case, *Hayward v. Marshall* (512 F.3d 536, 546-47 (9th Cir. 2008), a panel of
    the Ninth Circuit determined that under the "unusual circumstances" of that case, the unchanging
25  factor of the gravity of the petitioner's commitment offense did not, by itself, constitute some
    evidence supporting the governor's decision to reverse a parole grant on the basis that the
26  petitioner would pose a continuing danger to society.  However, on May 16, 2008, the Court of
    Appeals vacated the decision in order to rehear it en banc.  *Hayward v. Marshall*, 527 F.3d 797

1    ceramic lamp, tied her up, and then hacked and slashed her so ferociously that he almost

2    decapitated her.  (Exhibit 2 at 3, 7, 19.)  The victim suffered 23 significant wounds, primarily

3    around the head, face, and back areas, including lacerations and large slicing wounds across her

4    neck and face.  (*Id*. at 2, 19.)  Additionally, two ribs were fractured.  (*Id*. at 19.)  There were a

5    number of large bloodstains spattered throughout the bedroom walls, furnishings, and the

6    bathroom.  (*Id*.)  Upon this record, petitioner's offense was committed in an especially heinous,

7    atrocious, or cruel manner, as determined by the Board.  *See* Cal. Code Regs. tit. 15, §2281(b).

8            In order to rely on these circumstances of petitioner's offense as an unsuitability

9    factor for parole, however, there must be some rational nexus between the facts and the ultimate

10   conclusion that he continues to be a threat to public safety.  *In re Lawrence*, 44 Cal.4th at 1214,

11   1227 ("the aggravated nature of the crime does not in and of itself provide some evidence of

12   *current* dangerousness to the public unless the record also establishes that something in the

13   prisoner's pre- or post-incarceration history, or [ ] current demeanor and mental state, indicates

14   that the implications regarding the prisoner's dangerousness that derive from his or her

15   commission of the commitment offense remain probative to the statutory determination of a

16   continuing threat to public safety") (emphasis in original).  The relevant inquiry is an

17   individualized one: "whether the circumstances of the commitment offense, when considered in

18   light of other facts in the record, are such that they continue to be predictive of current

19   dangerousness many years after commission of the offense."  *In re Lawrence*, 44 Cal.4th at 1221.

20   The passage of time and attendant changes in the inmate's psychological or mental attitude are

21   relevant considerations.  *Id*.

22           In this case, the Board did not rely solely on the commitment offense in finding

23   petitioner unsuitable for parole.  Here, as in *In re Shaputis* (the companion case to *Lawrence*), the

24   Board was troubled not only by the aggravated nature of the offense, but also by evidence that the

25   ──────────────────

26   (9th Cir. 2008).  Therefore, the panel decision in *Hayward* is no longer citable precedent.

1   commitment offense was the culmination of previous violent behavior.  *See In re Shaputis*, 44

2   Cal.4th 1241, 1260 (2008).  Specifically, the Board considered the evidence before it that

3   petitioner had been implicated in other sex crimes.  A record of violence may tend to show a

4   prisoner's unsuitability for parole where "the prisoner on previous occasions inflicted or

5   attempted to inflict serious injury on a victim... [or] demonstrated serious assaultive behavior at

6   an early age."  15 Cal. Code Regs. § 2281(c)(2).[7]

7              Petitioner was not convicted of the other sexual assaults.  He contends that there

8   was no reliable evidence of his involvement.  The information contained in the probation

9   officer's report, which was before the Board, was as follows:

10              There exist three incidents, the most recent of which was initially
11              alleged in the Indictment, involving the defendant being identified
               by victims of previous incidents of rape and attempted rape.  These
12              include the following:

13              Information contained in a crime report filed by the San Joaquin
               County Sheriff's Office revealed that on January 28, 1973, two
14              juvenile sisters, ages fifteen and sixteen, students of Lincoln High
               School, reported an incident of attempted rape at their residence,
15              8343 Balboa Street in Stockton, California.  They described the
               suspect as a possibly Oriental male, age sixteen to seventeen, 5'4"
16              to 5'5", 130 pounds, having brown eyes and black hair, and
               wearing a blue shirt draped over his face.  The suspect brandished a
17              switchblade knife, with approximately a three to four-inch blade
               and forced both of the girls to disrobe, at which time he fondled
18              them.  One of the girls sought refuge in the bathroom at which time
               the suspect took the other sister into a bedroom where he lowered
19              his trousers and attempted an act of sexual intercourse, which she
               resisted.  Eventually, the victim managed to free herself of the
20              suspect and join her sister inside the locked bathroom.  Deputies
               subsequently located a knit cap and the blue shirt lying in the front
21              lawn area of the victim's home.  The girls also advised that the
               suspect had identified himself as a junior in high school.
22              Following his arrest for the instant offense, on February 24, 1976,

23   _____

     [7]  According to the Deputy District Attorney who spoke in opposition to petitioner's
24   release at his 2005 hearing, the most recent clinical evaluation reported that petitioner "is in the
     moderate to high risk category for violence should he parole."  (Pet. Exhibit 2 at 45-46.)  The
25   report concluded that "no matter how much insight the inmate gains into his behavior, he is still a
     risk to the community."  (Second Amended Petition at 14.)  The Board, however, did not rely on
26   this evaluation in it's decision finding petitioner unsuitable for parole, choosing instead to rely
     solely on the nature of his offenses and the evidence of his other prior sexual assaults.

one of the sisters notified deputies of the San Joaquin County Sheriff's Office that she had recognized the defendant's picture in the Stockton Record Newspaper as the individual who had assaulted both her and her sister.  She also advised deputies that she had seen the defendant earlier, during the spring in 1973, while riding with her mother in their family vehicle, on Alexandria Street near the area of Meadow Avenue, but that when they returned to the area, they were unable to locate him.  She also advised that her sister identified the defendant through the photograph in the newspaper.

Information contained in a crime report of the Stockton Police Department, dated December 15, 1973, reveals that two female juveniles, ages thirteen and fourteen, had reported to officers an incident of attempted rape and robbery at one of the girls' residence, 763 McDuff Avenue, in Stockton, a suspect, initially described as a Mexican or Oriental, of approximately fifteen to sixteen years of age, with black or brown straight hair, approximately 5'3" in height, wearing a white T'shirt and a nylon stocking over his head, and wearing light brown suede boots, surprised the girls inside the residence and brandished a 4-inch pocket knife.  The suspect forced both girls to disrobe and, after placing one of the girls in a bathroom, forced the other to lie on the bed, at which time he fondled her and performed oral copulation. One of the girls eventually fled the residence and ran to a neighbor from where the police were summoned.  Later, it was determined that approximately $410 in cash had also been removed from the residence.  Subsequently, on May 11, 1976, one of the victims identified the defendant through a photo lineup as the individual who looked like the person who had made the sexual advances toward her.

A third incident occurred on December 22, 1975, at approximately 8:15 p.m., when a fourteen-year-old girl, walking home from Sib's Market on Hammer Lane, was assaulted by a man, whom she later identified as the defendant through a photo lineup, while walking on Balboa Street near the Colonial Heights Grammar School.  She reported the defendant allegedly grabbed her from behind and struck her in the face and that he dragged her to the parking lot area on the west side of the school grounds.  He then forced her to hand over her wallet from which he removed money.  He then struck her in the face, again, and forced her to climb a cyclone fence at which time he dragged her to the middle of a field where he forced her to disrobe and submit to sexual intercourse and oral copulation.  She identified her assailant as having two scars, one on his shin and the other on his face, near his eye.  (Officers noted the defendant to have a small scar over his right eye and a scar on his left shin, from the knee down, when he was arrested on February 6, 1976.) Following her being released, the victim immediately fled to the home of her parents where deputies of the San Joaquin County Sheriff's Office were notified.

> During questioning by officers of the Stockton Police Department, the defendant admitted involvement in the incidents of January 28, 1973, and December 22, 1975.

(Resp. Exhibit 2 at 13-14.)

Petitioner was indicted by Grand Jury and charged with the December 22, 1975 forcible rape. (*Id*. at 5.) As set forth above, the charges were dismissed on the prosecutor's motion following his convictions for the commitment offenses against Jacobs. Regarding the evidence set forth in the probation officer's report, one member of the Board stated:

> I'm concerned about the victims in the other rapes, because they all identified you, according to the board report investigation. I know that you don't have any prior convictions, but the fact that your social history was so unremarkable and that this crime was so incredibly violent leads me to feel, leads this panel to feel, that there's no real indication that anything would be different if you were released....
>
> [O]ne of the reasons is because I don't know what happened in the other cases where the girls identified you as their assailant. I know you weren't convicted of those crimes, you know, but you can't un-ring that bell. And there's every indication to me that if [the victims] were aware of who their assailant was, that would make you a serial rapist, and convictions or not, it raises my antennae.

(Pet. Exhibit 2 at 56-57.) The Board commended petitioner for his participation in self help programming and noted that he had displayed control of his self-described anger issues while in prison. (*Id*. at 58.) In concluding that petitioner would still pose an unreasonable risk of danger to the public if released on parole, however, the Board noted with respect to petitioner's life offense that "this was a different kind of victim than the people you deal with here [in prison]." *Id*.

As set forth in the second amended petition, a previous panel of the Board had reviewed and questioned the reliability of the evidence contained in the probation officer's report and ultimately decided not to rely on that evidence. (Second Amended Petition at 18.) Nevertheless, the particular panel of the Board presiding over petitioner's 2005 hearing credited the evidence and decided to rely upon it in finding him unsuitable for parole. The Board was not

1  required to view the evidence in the same light as did the previous panel.  *See In re Rosenkrantz*,

2  *supra*, 29 Cal.4th at 656 (Board has the authority to resolve conflicts in the evidence and

3  determine the weight given to particular evidence).  In contrast, a reviewing court such as this

4  one is precluded from independently resolving conflicts in the evidence or determining the

5  amount of weight to be given to particular evidence.  *In re Scott*, 119 Cal.App.4th 871, 899 (4th

6  Dist. 2004).

7         Under the minimally stringent some evidence standard, only a modicum of

8  reliable evidence of petitioner's unsuitability is required.  *In re Lawrence*, 44 Cal.4th at 1205,

9  1226.  Based on the circumstances of petitioner's commitment offense and the evidence

10  contained in the probation officer's report which was properly before the Board, that modicum is

11  present in this case.  The particularly egregious circumstances of his commitment offenses, in

12  combination with the evidence that other victims identified petitioner as having raped them in

13  unrelated incidents, constitutes some evidence that he remains currently dangerous and would

14  pose an unreasonable risk to society if released from prison.

15         Petitioner additionally claims that his parole unsuitability finding violated his due

16  process rights because "the Board demanded that he fulfill conditions that had already been

17  fulfilled as a precondition for his being granted parole." (Second Amended Petition at 23.)  In

18  this regard, petitioner alleges that the Board based its decision at least in part on its "concern that

19  [he] needed further psychiatric evaluation and treatment." (*Id*. at 21.)  Petitioner alleges that it

20  would be impossible for him to meet this condition because there is no other relevant self-help or

21  therapy programming available to him in which he has not already participated or continued to

22  participate. (*Id*. at 23.)

23         Although one member of the Board did state his concern that petitioner needed

24  further treatment, the Board did not expressly rely on a lack of programming or need for further

25  psychiatric evaluation and treatment in finding petitioner unsuitable for parole.  Moreover, even

26  if the Board relied on this factor in error, as petitioner alleges, under the minimally stringent

1    some evidence standard, the decision must be upheld because there was other evidence in the

2    record that could support the conclusion reached by the Board.  *See Sass*, 461 F.3d at 1128

3    ("relevant question is whether there is any evidence in the record that could support the

4    conclusion reached"); *Biggs*, 334 F.3d at 916 (despite the fact that several of the Board's reasons

5    for denying parole were not supported by the record, some evidence as to one of the Board's

6    reasons was sufficient to preclude habeas relief).

7               B.      Eighth Amendment

8               Petitioner additionally contends that the Board's denial of parole has implicated

9    his Eighth Amendment right to be free from cruel and unusual punishment.  A criminal sentence

10   that is not proportionate to the crime of conviction may indeed violate the Eighth Amendment.

11   Outside of the capital punishment context, however, the Eighth Amendment "forbids only

12   extreme sentences that are grossly disproportionate to the crime." *United States v. Bland*, 961

13   F.2d 123, 129 (9th Cir. 1992) (*quoting Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991)

14   (Kennedy, J., concurring).  The gross disproportionality rule set forth by the Supreme Court in

15   *Harmelin* is the only clearly established law applicable to petitioner's Eighth Amendment

16   challenges to the Board's decision.  *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003).

17              Petitioner asserts that his 2005 parole suitability hearing was "a pro forma parole

18   hearing in which he could not demonstrate his suitability for parole."  He further contends that

19   the Board's denial has imposed on him an effective life sentence without the possibility of

20   parole.  These arguments must be rejected.  So long as the Board's decision is supported by some

21   reliable evidence, as it was in this case, it cannot be said that petitioner's hearing was "pro

22   forma" or that the Board effectively converted his sentence to that of life without the possibility

23   of parole.  Moreover, the Ninth Circuit has held that under *Harmelin*, even a mandatory life

24   sentence for murder would not constitute cruel and unusual punishment.  *United States v.*

25   *LaFleur*, 971 F.2d 200, 211 (9th Cir. 1991).

26   /////

14

1        C.      Individualized Consideration

2        The record belies petitioner's assertion that the Board failed to give him

3  individualized consideration at his 2005 parole suitability hearing.  The Board expressly

4  considered his offense, the therapy programs in which he has participated, along with many other

5  individualized factors.  The second amended petition references various testimony and/or

6  statements of Board officials during the time period of 1999-2001 regarding an alleged "no

7  parole" policy for convicted murderers.  There is, however, no relevant evidence of the existence

8  of any such policy at the time of petitioner's 2005 parole hearing, nor evidence that the particular

9  panel of the Board presiding over petitioner's 2005 parole hearing was not neutral and detached.

10  The conclusory allegations that petitioner was denied individualized consideration by the Board

11  fail to state a claim for habeas corpus relief.  *See generally Jones v. Gomez*, 66 F.3d 199, 204-05

12  (9th Cir. 1995), *cert. denied*, 517 U.S. 1143 (1996) (conclusory allegations insufficient to support

13  claim for habeas relief).

14                          VI.  CONCLUSION

15        For the foregoing reasons, the decision of the California Supreme Court upholding

16  the Board's denial of parole is not contrary to, or an unreasonable application of, clearly

17  established federal law as determined by the Supreme Court, nor based on an unreasonable

18  determination of facts in light of the evidence presented.  Accordingly, IT IS HEREBY

19  RECOMMENDED that petitioner's application for a writ of habeas corpus be DENIED.

20        These findings and recommendations are submitted to the United States District

21  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

22  days after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties.  Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

25  shall be served and filed within ten days after service of the objections.  The parties are advised

26  that failure to file objections within the specified time may waive the right to appeal the District

1   Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

2   DATED: July 31, 2009

3                                    *Charlene H. Sorrentino*
                                    CHARLENE H. SORRENTINO
4                                    UNITED STATES MAGISTRATE JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26